**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

**HOUSTON ZOO, INC.
D/B/A THE HOUSTON ZOO,**

    **Plaintiff,**

    **v.**

                                 **CAUSE NO.: 4:19-cv-1593**

**HOUSTON INTERACTIVE
AQUARIUM AND ZOO LLC,**

    **Defendant.**                           **JURY TRIAL DEMANDED**

---

**VERIFIED ORIGINAL COMPLAINT AND APPLICATION FOR TEMPORARY
RESTRAINING ORDER, PRELIMINARY INJUNCTION,
AND PERMANENT INJUNCTION**

Plaintiff Houston Zoo, Inc. d/b/a the Houston Zoo (the "Houston Zoo"), files this Verified Original Complaint and Application for Temporary Restraining Order, Preliminary Injunction, and Permanent Injunction against Defendant, Houston Interactive Aquarium and Zoo LLC ("Defendant"), and in support thereof would respectfully show the Court as follows:

## I.    PRELIMINARY STATEMENT

1.    The Houston Zoo sues under the Federal Lanham Act, 15 U.S.C. §§ 1051 *et seq.*, and Texas state law to immediately stop Defendant from infringing the Houston Zoo's "HOUSTON ZOO" trademarks. Defendant, a for profit, unaccredited company purporting to offer an aquarium and zoo, has no physical facilities whatsoever. Despite this, Defendant is selling "half price" "annual passes" in commerce under the names "HOUSTON AQUARIUM AND ZOO" and "HOUSTON INTERACTIVE AQUARIUM AND ZOO," which infringe the Houston Zoo's famous and distinctive HOUSTON ZOO Marks and damage the goodwill the Houston Zoo has built over nearly a century. Defendant is also harming the public—people are actually confused

and frustrated when they purchase Defendant's unusable membership passes and show up with their families at the Houston Zoo expecting to gain admission with such passes. This is happening on an ongoing basis, escalating to a significant degree on Sunday, April 28, 2019, despite the Houston Zoo demanding that Defendant cease and desist its activities through all available means of communication. Along with damages, the Houston Zoo seeks immediate injunctive relief, and files its Application for Temporary Restraining Order contemporaneously herewith.

## II. PARTIES

2.      Plaintiff, Houston Zoo, Inc. (the "Houston Zoo"), is a Texas non-profit corporation organized under 26 U.S.C. § 501(c)(3) with its principal place of business at 1513 Cambridge Street, Houston, Texas 77030.

3.      Defendant, Houston Interactive Aquarium and Zoo LLC ("Defendant"), is a domestic, limited liability, for profit company with its principal place of business at 5440 N. Sam Houston Parkway East, Houston, Texas 77032, and may be served through its registered agent, Registered Agents Inc., 700 Lavaca Street, Suite 1401 Austin, Texas 78701.

## III.      JURISDICTION AND VENUE

4.      This Court has original jurisdiction over this action under 15 U.S.C. §§ 1121 and 28 U.S.C. §§ 1331 and 1338 because it involves substantial claims arising under the Lanham Act (15 U.S.C. §1051 *et seq.*) and supplemental jurisdiction under 28 U.S.C. § 1367 with respect to state-law based claims.

5.      This Court has personal jurisdiction over Defendant because Defendant is a Texas entity with its principal place of business in Texas. Further, the complained-of acts occurred in this District and/or have sufficient minimum contacts with this District.

6. Venue is proper in the Houston Division of the Southern District of Texas pursuant to 28 U.S.C. § 1391 because a substantial part of the complained-of acts took place in this District.

## IV. FACTUAL BACKGROUND

### A. The Houston Zoo

7. Houston Zoo, Inc. is the owner and operator of the Houston Zoo, one of the nation's premier zoological parks and one of the top attractions in greater Houston. Spanning 55 acres in the heart of Houston, the Houston Zoo is home to animals from all corners of the globe, including over 900 different species.

8. Since 1922, the Houston Zoo has been providing entertainment and wildlife education to people from across the country. Originally known as both the Hermann Park Zoo and the Houston Zoological Gardens, the Houston Zoo began using the "Houston Zoo" name as early as 1926, as seen in the below postcard of "Tex" the tiger officially issued by the Houston Zoo:



3

*See* Exhibit A.

9.      The Houston Zoo continued to use the "Houston Zoo" name throughout the ensuing

decades on Zoo advertising, merchandise, and signage, as seen in the below examples:

a.   1960s (*See* Exhibit B):





b.   2000s:



10.     In 2002, Houston Zoo, Inc., a non-profit corporation, took over operation of the Houston Zoo from the City of Houston. From that time, Houston Zoo, Inc. has grown the Houston Zoo exponentially.

11.     Now, the Houston Zoo is the second most visited zoo in the United States among those that charge admission. More than 2 million visitors attend the Houston Zoo each year— 2,409,017 visited the Zoo in 2017 alone.

12.     As part of its mission to "connect communities with animals, inspiring action to save wildlife," the Houston Zoo strives to make itself accessible to everyone. 26.7% of Zoo guests visit the Zoo for free or at heavily discounted prices. The Zoo hosts over 87,000 free admission field trip students a year.

13.     The Houston Zoo is also a leader in both local and worldwide zoological conservation, contributing millions of dollars a year and working with 47 conservation partners in 26 countries to protect wildlife. By way of example, the Houston Zoo has worked to save and

protect the Houston Toad species and injured sea turtles, as well as mountain gorillas and lions in Africa and elephants in Borneo.

14.     Notably, the Houston Zoo is accredited by the Association of Zoos and Aquariums, the primary accrediting body for zoos and aquariums in the United States. In 2018, during the annual conference of the AZA in Seattle, Washington, the Houston Zoo was presented with five major awards in recognition of its contributions in wildlife conservation and volunteer engagement.

15.     The Houston Zoo expends a significant portion of its revenue on advertising, marketing, and promotion of its business and brand. In 2018 alone, the Houston Zoo spent over $4,000,000 on advertising, marketing, and promotional efforts. From 2010 through 2018, the Houston Zoo spent over $27,000,000.

16.     The Houston Zoo celebrates its centennial anniversary in 2022. In connection with this celebration, the Houston Zoo unveiled its *Keeping Our World Wild: Centennial Campaign* to raise $150,000,000 to improve the Houston Zoo and make it a richer and more immersive experience for its customers. Over half the zoo will be redeveloped in connection with the campaign. New features will include:

> a.   A Texas Wetlands multi-species habitat
>
> b.   A South American wetland multi-species habitat
>
> c.   A redesigned Bird Garden and new Avian Conservation Center
>
> d.   A Galapagos Islands exhibit
>
> e.   New Arrival Plaza, restaurants, and event space

The centennial campaign has garnered significant media coverage throughout the State of Texas. *See, e.g.*, April 9, 2018 Houston Chronicle article located at

6

https://www.chron.com/neighborhood/bellaire/news/article/150-million-campaign-announced-for-Houston-Zoo-12818588.php, a true and correct copy of which is attached hereto as Exhibit C.

**B.  The Houston Zoo Marks**

17.    The Houston Zoo has used the name and trademark HOUSTON ZOO continuously since 1926 in connection with its zoo services. Indeed, the Houston Zoo brand and reputation as one of the country's top zoos have taken generations to build.

18.    The Houston Zoo is also the owner of the following U.S. federal trademark application and registration for HOUSTON ZOO:

| Mark (U.S. Application/ Registration No.) | Goods/Services | First Use |
|---|---|---|
| HOUSTON ZOO (88/377,568) | Zoos (class 41) | 1926 |
| Houston Zoo (5,621,451) | Zoo Services (class 41) | April 2018 |

(The "HOUSTON ZOO Marks.")  True and correct copies of the application and registration are attached hereto as Exhibits D & E, respectively.[1] The Houston Zoo also owns common law rights in both of these trademarks.

19.    The HOUSTON ZOO Mark (Application No. 88/377,568), which has been exclusively used by the Houston Zoo since 1926, has acquired secondary meaning over its long period of use and is therefore distinctive. Customers across the world recognize the HOUSTON ZOO Mark because of the Houston Zoo, and it is therefore a famous mark.

---

[1] On May 1, 2019, the Houston Zoo amended its application (Exhibit D) to revise its date of first use from 1922 to 1926. A copy of the revised application will be forwarded to the Court upon request once received.

20.     The Stylized HOUSTON ZOO Mark (Registration No. 5,621,451) was created in connection with the Houston Zoo's *Keeping Our World Wild: Centennial Campaign*. Its design is meant to invoke the connection people share with the world around them and reflect the Houston Zoo's commitment to saving animals in the wild. The Houston Zoo uses Stylized HOUSTON ZOO Mark in all manner of advertising, merchandise, signage, and printed materials.

21.     The Houston Zoo has not licensed the use of its trademarks to any third party, except in instances of joint promotions or events specifically undertaken in coordination with the Houston Zoo itself. In such instance, the Houston Zoo closely restricts and monitors the usage of its name and trademarks.

## C.  Houston Interactive Aquarium and Zoo LLC's Infringing Activities

22.     Defendant Houston Interactive Aquarium and Zoo LLC filed its certificate of formation with the Texas Secretary of State on November 14, 2018.

23.     Defendant alternatively refers to itself as "Houston Aquarium and Zoo" and "Houston Interactive Aquarium and Zoo" on its online website (https://houstonaquariumtx.com/) and Facebook (https://www.facebook.com/pages/Houston-Interactive-Aquarium-and-Zoo/1182140678606242) pages. *See* Exhibits F & G, true and correct copies of excerpts from Defendant's website and Facebook page, respectively. These names are confusingly similar to the HOUSTON ZOO Marks, and have resulted in numerous instances of actual confusion, as set forth herein.

24.     The Houston Zoo is listed on Defendant's Facebook page as a "Related Page"—as of the time of filing, the Houston Zoo was the first shown result:



*See* Exhibit G.

      25.    Defendant also uses the following logo on its website and Facebook pages:[2]



---

[2] In addition to infringing the Houston Zoo's trademarks, the Court will note that Defendant also appears to infringe Disney Enterprises, Inc.'s intellectual property—copying Disney's "Nemo" clownfish character from the films, *Finding Nemo* and *Finding Dory*.

*See id.*

26.     As of this filing, Defendant's Facebook page lists 15 people who have "visited" the Houston Interactive Aquarium and Zoo, which is currently an undeveloped piece of real estate:



*See* Exhibit H. These 15 people who claim to have visited the Houston Interactive Aquarium and Zoo are actually confused about where they actually went.

27.     Defendant is engaged in commerce—it sells "50% off" "annual passes" to an aquarium and zoo that does not exist, but that will purportedly open at the beginning of December, 2019. As of this filing, there were no permanent structures on the premises of Defendant's purported address, 5440 N. Sam Houston Parkway East, Houston, Texas 77032.

28.     None of the photographs posted on Defendant's website and Facebook page that depict actual aquarium and zoo facilities are of the Houston Aquarium and Zoo, because the Houston Aquarium and Zoo is an empty tract of land off Sam Houston Parkway. These photographs are necessarily taken from other zoo and aquarium facilities. Defendant often affixes its logo to these misleading photographs:



*See* Exhibit G.

29.     Defendant also has photographs posted on its Facebook page of "Visitor photos at Houston Interactive Aquarium and Zoo." The photographs are images not of the Houston Interactive Aquarium and Zoo, which does not exist, but rather several are **from the Houston Zoo's Kipp Aquarium**:

11



*See* Exhibit I. Each of these photographs is from the Houston Zoo.

**D.  Numerous Instances of Actual Confusion Beginning in April 2019**

30.    The Houston Zoo has already encountered an extraordinary number of instances of actual confusion as a result of Defendant's trademark infringement. As of this filing, there have been over 30 documented instances of actual confusion—where confused customers thought there was an affiliation between Defendant and the Houston Zoo or thought they were the same. The majority of these individuals had mistakenly purchased membership passes sold by Defendant; again, Defendant is advertising these passes as half off the regular price.

31.     As of the April 27, 2019 weekend, the number of instances of actual confusion has grown out of control, necessitating immediate injunctive relief. A true and correct copy of the Houston Zoo's timeline of instances of actual confusion is attached hereto as Exhibit J. Compiled and attached to this timeline as sub-exhibits for the Court's convenience are true and correct copies of records of actual confusion. This timeline and compilation of exhibits does not and cannot capture all instances of actual confusion that the Houston Zoo has encountered—due to the sheer number of personnel who have encountered customers confused by Defendant, an accurate figure is not possible. In addition, compiled and attached hereto as Exhibit K are true and correct copies of additional indicia of actual confusion.

32.     Upon information and belief, Defendant began selling annual membership passes on or about March 8, 2019, despite the fact that there would be no actual Houston Aquarium and Zoo for its customers to visit for nine (9) months.

33.     At least some of Defendant's email receipt sent to customers purchasing membership passes informs the customers that: "Passes are NOT mailed to you. You receive your pass when you first visit." *See* below and Exhibit J-4:



This is despite the fact that the Houston Aquarium and Zoo cannot be visited at all—thus anyone actually confused by this organization is also effectively being told to show up at the Houston Zoo with an invalid receipt to obtain his or her membership pass.

34.     On Friday, April 5, 2019, an irate customer confronted Houston Zoo Admission personnel to complain that she bought a membership to the "Houston Aquarium and Zoo" and was not granted admission into the Houston Zoo. *See* Exhibit J-1.

35.     On Saturday, April 6, 2019, two guests asked Houston Zoo Admission personnel if the Houston Zoo was the Houston Aquarium and Zoo they saw advertising a cheap membership deal. They were informed that Defendant was not the Houston Zoo. *See* Exhibit J-2.

36.     On Tuesday, April 9, 2019, another confused guest arrived at the Houston Zoo with a membership sold by Defendant and attempted to gain admission. On that same day, the Houston Zoo received three (3) additional phone calls from customers confused by Defendant's recently sold memberships to its nonexistent Houston Aquarium and Zoo.

37.     On Wednesday, April 10, 2019, a former member of the Houston Zoo bought a membership from Defendant thinking it was for the Houston Zoo, then *drove an hour and a half* to the Houston Zoo for a visit. This former Houston Zoo member filled out this comment card:



Please let us know how we can serve you better!

Date and Time of Your Visit: @ April 10-2019

Question or Comment:

We bought tickets for the Houston Aquarium&Zoo thinking it was this Zoo and the Aquarium.

Response: note: they drove 1½ h to get here thinking they had a membership. ◊ / They were members FPremium in 2016-2017

Thank you for your question/comment! We learned something new too!
We hope you will visit the Zoo again soon.
— Zoo Management

*See* Exhibit J-3.

38.     Also on April 10, a Houston Zoo customer who purchased a "half price off" pass to the Houston Aquarium and Zoo and brought her grandson to the Houston Zoo only to find that she did not buy the right membership pass—she was confused by Defendant. She wrote a heartfelt email to the Houston Zoo, enclosing her receipt, and stated that she was "very upset and embarrassed." *See* Exhibit J-4. The email is transcribed in full below:

> Hello my name is [NAME REDACTED] I bought a pass to this site that said it was for the Houston zoo and Aquarium it says half price off I assumed it was for the Houston Zoo but it appears not to be I took my grandson to the zoo yesterday to find  out it was not for you' zoo I was very upset and embarrassed knowing that there is only one zoo in Houston I wondering is there anyway something could be done I paid money I am attached the receipt for what I paid

*See id.*

39.      On Friday, April 12, 2019, another customer arrived at the Houston Zoo with a receipt showing a purchase of Defendant's Houston Aquarium and Zoo membership, and that person also attempted to pick up his membership card and access the Houston Zoo—likely because the email receipt he received from Defendant indicated in-person pick-up was required. *See* Exhibit J-5.

40.     On Thursday, April 18, 2019, the Houston Zoo received two calls from customers confused by Defendant. One customer asked the Houston Zoo about discounted memberships that were actually being offered by Defendant. *See* Exhibit J-6. The other customer had purchased a membership from Defendant to the Houston Aquarium and Zoo and thought she had purchased a Houston Zoo membership. *See id.*

41.     On Friday, April 19, 2019, a Houston Zoo customer who purchased a membership from Defendant called the Houston Zoo to express confusion to the Houston Zoo. *See* Exhibit J-7. On that same day, another customer contacted the Houston Zoo membership department thinking

he had purchased a Houston Zoo membership when he had actually bought Defendant's membership. *See* Exhibit J-8. In addition, a customer showed up with his family to the Houston Zoo with what they thought was a Houston Zoo membership, but it also turned out to be a membership sold by Defendant. *See* Exhibit J-11. The customer said he felt like the *Houston Zoo* had engaged in "false advertising." *See id.*

42.     On Easter Sunday, April 21, 2019, another customer came to the membership window and stated that she had purchased the "$80 membership." *See* Exhibit J-9. She was also confused and thought she had purchased a Houston Zoo membership from Defendant. *See id.*

43.     On Monday, April 22, 2019, a customer showed one Houston Zoo employee her receipt for a membership pass sold by Defendant and asked where to pick her membership up. *See* Declaration of Nathalie Jolicoeur, attached hereto as Exhibit L. Another 3 guests asked the same employee about the $80 special for family memberships at the Houston Zoo—this was being offered by Defendant instead. *See id.* Another family went to the Membership Services window with a receipt from Defendant, and were upset when they found out it was not a Houston Zoo membership. *See* Exhibit J-11. Yet another customer attempted to use a "Houston Interactive" membership purchased from Defendant at the Houston Zoo, and claimed she was "misled" in her customer comment card:

*See* Exhibit J-10.

44.     On Wednesday, April 24, 2019, a customer called the Houston Zoo asking specifically about the "family plan for $80 with the aquarium." Exhibit J-12. Upon being informed that that offered was made by Defendant, not the Houston Zoo, the customer said she was glad she called the Houston Zoo to ask because she didn't want to be "scammed" by Defendant. *Id.*

45.     On Thursday, April 25, 2019, a Houston Zoo employee in the membership sales department reported that she was encountering at least one guest per day during the week who had purchased a membership pass from the Defendant and attempted to gain admission to the Houston Zoo, but they did not want to leave a comment card because they were upset.

46.     On Friday, April 26, 2019, a Houston Zoo employee located a post on Defendant's Facebook page of an individual who was actually confused when she bought Defendant's membership pass:



*See* Exhibit J-13.

47.     On Saturday, April 27, there were several instances of actual customer confusion. Three separate guests arrived with their families and sought to use membership passes purchased from Defendant. *See* Exhibits J-14, J-15, and J-16). Two other individual guests also did the same thing, bringing the total to 5 individuals that day who actually purchased Defendant's passes by mistake. *See* Exhibit J-14.

48.     On Sunday, April 28, 2019, the dam broke—the Houston Zoo's Manager of Member Relationships recounts speaking with approximately 10 confused customers throughout the day outside the front gate to the Houston Zoo who thought the membership passes sold by the Houston Aquarium and Zoo were sold by the Houston Zoo. *See* Exhibit L. Numerous additional confused customers spoke with the manager's staff members, who then relayed that information back to the manager. *See id.*

49.     Also on that Sunday, another customer arrived at the Houston Zoo and was angry the annual pass she bought from Defendant did not work. She later sent an emotional email to the Houston Zoo, enclosing her receipt from Defendant, indicating that she purchased a "HoustonZoo

19

Membership" from an ad she saw "online." *See* Exhibit J-17. She states in her email that "This add clearly said Houston Zoo. It is very misleading and should be considered fraudulent." *Id.*

50.    Finally, on that Sunday, a Houston Zoo employee located a post on the Houston Aquarium and Zoo's Facebook page of an individual who says "I'm confused" about what Defendant is and whether it is affiliated with the Houston Zoo:



*See* Exhibit J-18.

51.    These concrete and voluminous examples of actual confusion are buttressed by substantial additional indicia of actual confusion:

     a.    The person who posted photographs of the Houston Zoo's Kipp Aquarium to Defendant's Facebook page, as discussed above, was clearly confused (*see* Exhibit I);

     b.    The 15 people who claimed to have visited Defendant were clearly confused, and likely thought they visited the Houston Zoo and/or it's Kipp Aquarium (*see* Exhibit G); and

c. Numerous individuals on Facebook have expressed apparent confusion about whether Defendant was the Houston Zoo, or whether they were affiliated. For example, see:



And:



And:



And:



I'd like an interactive session with Hasani please! 🙂

5d   Like   Reply

Each of these additional pieces of evidence of confusion are attached here as Exhibit K.[3]

## E.  The Effect of Defendant's Infringing Activities

52.    Defendant's unauthorized use of the "HOUSTON AQUARIUM AND ZOO" and "HOUSTON INTERACTIVE AQUARIUM AND ZOO" marks (the "Infringing Marks") is likely to cause confusion, to cause mistake, and/or to deceive customers and potential customers of the parties at least as to some affiliation, connection, or association of Defendant with the Houston Zoo, or as to the origin, sponsorship, or approval of Defendant's products and services with the Houston Zoo. As noted, there are numerous instances of actual confusion, the strongest evidence of likelihood of confusion—and new instances of actual confusion are happening each day. Based on the sheer number of confused individuals who arrived at the Zoo on April 28, the rate of actual confusing is increasing at an alarming rate.

53.    Defendant's unauthorized use of the Infringing Marks also enables Defendant to trade on and receive the benefit of goodwill built up at the cost of great expense and effort by the Houston Zoo over many years, and allows Defendant, a for profit entity, to gain consumer approval of its products on the reputation and customer goodwill associated with the non-profit Houston Zoo. This also impairs the Houston Zoo's ability to control the nature and quality of products provided under and/or associated with the HOUSTON ZOO Marks, conferring a portion of that control over the Houston Zoo's valuable reputation and goodwill to Defendant.

---

[3] For the Court's reference, Hasani is one of the Houston Zoo's well-known male lions whose arrival in 2017 garnered local news coverage.

54.    Defendant's unauthorized use of the Infringing Marks is further likely to cause dilution of the famous HOUSTON ZOO Marks.

55.    Moreover, there is a public harm component to Defendant's conduct that cannot be overstated. People are being actively misled into buying membership passes they cannot use when they show up at the Houston Zoo with their families. These are being sold by a for-profit, fly-by-night entity with no physical operations that appears to be deliberately trading on the Houston Zoo's name and reputation.

56.    In light of the harm Defendant is doing to the Houston Zoo, the Houston Zoo is forced to take appropriate action to enforce its rights.

**F.  Cease and Desist Correspondence and Other Communications with Defendant**

57.    On Wednesday, April 17, 2019, undersigned counsel sent a cease and desist letter to Defendant demanding that, among other things, Defendant immediately cease using the names "Houston Interactive Aquarium and Zoo" and "Houston Aquarium and Zoo." *See* Exhibit M; *id.* at Exhibit M-1.

58.    Undersigned counsel had this cease and desist correspondence hand-delivered to Defendant's Houston address, 5440 N. Sam Houston Parkway East, Houston, Texas 77032, and sent by registered email to the email address located on Defendant's website. *See* Exhibit F. Undersigned counsel further sent the letter certified mail, return receipt requested, to Defendant's Houston address and Defendant's registered agent for service of process, Registered Agents Inc., 700 Lavaca Street, Suite 1401 Austin, Texas 78701. *Id.*

59.    Defendant failed to respond to the cease and desist letter by the due date provided of Tuesday, April 23, 2019.

60.     On Tuesday, April 23, 2019, at approximately 5:10 PM, undersigned counsel called Defendant at the phone number listed on the company's website to inquire whether or not Defendant intended to strictly comply with the Houston Zoo's cease and desist letter demands. *Id.* Defendant's employee asked what the issue was, and undersigned counsel stated that the Houston Zoo demanded that Defendant stop using the names "Houston Interactive Aquarium and Zoo" and "Houston Aquarium and Zoo." *Id.* Defendant's employee then asked for the contact information for undersigned counsel, which was provided to her. *Id.* Defendant's employee further represented that she would "try to get this off to the right people and try to have somebody get in contact with you." *Id.* Undersigned counsel informed Defendant's employee that the Houston Zoo required immediate compliance or would be required to pursue its legal remedies. *Id.*

61.     Undersigned counsel received no response from Defendant as of this filing (well after the Houston Zoo's cease and desist letter was hand delivered, emailed, and sent by certified mail to Defendant). On April 28, 2019, the instances of actual confusion suffered by customers at the Houston had increased to an alarming rate. Therefore, the Houston Zoo was forced to file this lawsuit and seek immediate injunctive relief to prevent Defendant's trademark infringement, unfair competition, and other misconduct.

## VI.     CAUSES OF ACTION

62.     Each of the following causes of action is alleged in the alternative, but only to the extent necessary.

63.     The factual allegations contained herein are incorporated into each of the following counts as if fully set forth therein.

24

## COUNT ONE
## FEDERAL TRADEMARK INFRINGEMENT (15 U.S.C. § 1114)

64.   As its first ground for relief, the Houston Zoo alleges federal trademark infringement under §32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

65.   Defendant's use of the "Houston Interactive Aquarium and Zoo" and "Houston Aquarium and Zoo" marks infringes upon the Houston Zoo's trademarks, including the federally registered HOUSTON ZOO mark, U.S. Registration No. 5,621,451 (the "Stylized HOUSTON ZOO Mark") for zoo services in Trademark Class 41. *See* Exhibit E.

66.   The Houston Zoo has continuously used the HOUSTON ZOO Word Mark since 1926 (*see* Exhibit D, pending federal Application No. 88/377,568), and the Stylized HOUSTON ZOO Mark since April 2018.

67.   The Houston Zoo has used its trademarks, including the federally registered Stylized HOUSTON ZOO Mark, prior to Defendant's incorporation on November 14, 2018 and subsequent use of its Infringing Marks.

68.   The Houston Zoo has invested substantial time, effort, and financial resources promoting the HOUSTON ZOO Marks in connection with the marketing and sale of its goods and services.

69.   The Houston Zoo has spent many millions of dollars from the time it began use of the HOUSTON ZOO Marks to advertise and promote its brand and the services the Houston Zoo provides. In 2018 alone, the Houston Zoo spent over $4,000,000 on advertising, marketing, and promotional efforts. From 2010 to 2018, the total expenditure was over $27,000,000.

70.   As a result of the Houston Zoo's national marketing efforts and extensive, exclusive use of the HOUSTON ZOO Marks, the HOUSTON ZOO Marks are widely recognized by the general public as well as by those in the zoo industry. The general public and those in the industry

understand the HOUSTON ZOO Marks as identifying the Houston Zoo's goods and services, and they associate the marks exclusively with the Houston Zoo.

71.     The HOUSTON ZOO Marks, through widespread and favorable acceptance and recognition, have become an asset of substantial value as a symbol of the Houston Zoo, its quality products and services, and its goodwill.

72.     Defendant advertises and offers "annual passes" for sale using the Infringing Marks and, upon information and belief, have done so with the intention of misleading, deceiving, or confusing consumers as to the origin of its goods and services, trading on the Houston Zoo's reputation and goodwill. Defendant's Infringing Marks appear designed to work a fraud on the Houston Zoo's customers insofar as Defendant is selling memberships for a zoo that does not exist, and Defendant will not cease using its confusing marks despite the Houston Zoo's demands that it do so.

73.     Defendant's actions are likely to lead the public to conclude, incorrectly, that Defendant's goods and services originate with or are authorized by the Houston Zoo, which false belief has damaged and will continue to damage both the Houston Zoo and the public.

74.     The Houston Zoo has requested in writing and telephonically that Defendant cease and desist from the infringing actions, but Defendant has failed to comply with these requests. *See* Exhibit M.

75.     Defendant's unauthorized use of the Infringing Marks in commerce as described above, constitutes trademark infringement under 15 U.S.C. §1114(1) and is likely to cause consumer confusion, mistake, or deception.

76.     As a direct and proximate result of Defendant's trademark infringement, the Houston Zoo has suffered and will continue to suffer loss of income, profits, and goodwill, and Defendant has and will continue to unfairly acquire income, profits, and goodwill.

77.     Defendant's acts of infringement will cause further irreparable injury to the Houston Zoo if Defendant is not restrained by this Court from further violation of the Houston Zoo's rights, for which the Houston Zoo has no adequate remedy at law.

**COUNT TWO**
**UNFAIR COMPETITION UNDER 15 U.S.C. §1125(a)**

78.     As its second ground for relief, Plaintiff alleges federal unfair competition under §43(a) of the Lanham Act, 15 U.S.C. §1125(a).

79.     The Houston Zoo has continuously used the HOUSTON ZOO Word Mark since 1926 in connection with zoo services.

80.     The Houston Zoo has used its HOUSTON ZOO Word Mark in most of its advertising, promotion and marketing efforts throughout its existence, in print, video and web-based media. The Houston Zoo has used its Stylized HOUSTON ZOO Mark in advertising, promotional activities, and other media since 2018.

81.     By virtue of the Houston Zoo's exclusive, continuous, and extensive use of the HOUSTON ZOO Word Mark (No. 88/377,568) since 1926, the mark has acquired secondary meaning and is therefore distinctive.

82.     Defendant's Infringing Marks are confusingly similar in sound, appearance, and connotation to the HOUSTON ZOO Marks. Defendant's purported services are also similar in that they consist of zoo and aquarium services offered to the general public. Moreover, Defendant offers essentially identical "annual passes" individuals and families, like the Houston Zoo, to attend the Houston Aquarium and Zoo.

27

83.     Defendant's actions were and are intended, and are likely to cause confusion, mistake, or deception as to the source of origin, sponsorship, or approval of Defendant's services, in that purchasers or others are likely to believe—and have believed—that Defendant's services are associated with the Houston Zoo's services, or that Defendant's services are legitimately connected with or related to the Houston Zoo.

84.     Defendant's unauthorized marketing and sale of "membership" passes in interstate commerce on its website using the Infringing Marks constitutes use of a false designation of origin or false representation that wrongfully and falsely designates Defendant's products and services as originating from or connected with the Houston Zoo and constitutes the use of false descriptions or representations in interstate commerce.

85.     Defendant's actions constitute federal unfair competition and false designation of origin, and they violate 15 U.S.C. § 1125(a).

86.     As a direct and proximate result of Defendant's unfair competition, the Houston Zoo has suffered and will continue to suffer loss of income, profits, and goodwill, and Defendant has and will continue to unfairly acquire income, profits, and goodwill.

87.     Defendant's acts of unfair competition will cause further irreparable injury to the Houston Zoo if Defendant is not restrained by this Court from further violation of the Houston Zoo's rights, for which the Houston Zoo has no adequate remedy at law.

## COUNT THREE
## TRADEMARK DILUTION UNDER 15 U.S.C. § 1125(c)

88.     As its third ground for relief, the Houston Zoo hereby alleges that Defendant have violated § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c).

89.     The Houston Zoo's HOUSTON ZOO Word Mark has become distinctive and famous as a result of many years of nationwide use and promotion of the marks by the Houston Zoo.

90.     Further, the HOUSTON ZOO Word Mark is distinctive and famous within the meaning of 15 U.S.C. § 1125(c) and became famous long before Defendant's first use of the Infringing Marks.

91.     Defendant's first use of the Infringing Marks in interstate commerce occurred well after the HOUSTON ZOO Word Mark had become famous.

92.     Defendant's unauthorized use of the Infringing Marks in interstate commerce in the sale, advertising, and promotion of its goods and services dilutes the distinctiveness, strength, and value of the HOUSTON ZOO Word Mark.

93.     Without injunctive relief, the Houston Zoo has no means by which to control the continuing dilution of the distinctiveness of the HOUSTON ZOO Word Mark.  If Defendant is not restrained by this Court, the Houston Zoo will continue to be irreparably injured, as no adequate remedy exists at law.

## COUNT FOUR
## VIOLATION OF TEXAS ANTI-DILUTION STATUTE

94.     As its fourth ground for relief, Plaintiff alleges a violation of the Texas Anti-Dilution Statute, Texas Business and Commerce Code Section 16.29.

95.     The HOUSTON ZOO Mark is strong and distinctive, and it is in exclusive permitted use by the Houston Zoo. The HOUSTON ZOO Mark is famous statewide, having been used consistently for over 90 years in connection with zoo services. The HOUSTON ZOO Mark is widely recognized by the public throughout this state as a designation of the source of goods and services provided by the Houston Zoo.

29

96.     Defendant's use of the confusingly similar Infringing Marks is likely to injure the Houston Zoo's business and reputation and dilute the distinctive quality of the famous HOUSTON ZOO Marks.

97.     Defendant has gained a financial benefit they have not earned and have caused financial loss and irreparable harm to the Houston Zoo, for which the Houston Zoo has no adequate remedy at law.

**COUNT FIVE**
**COMMON LAW TRADEMARK INFRINGEMENT**

98.     As its fifth ground for relief, the Houston Zoo alleges that Defendant's actions and inactions described herein constitute trademark infringement under Texas common law.

99.     The Houston Zoo has no adequate remedy at law for the damage caused thereby.

**COUNT SIX**
**COMMON LAW UNFAIR COMPETITION**

100.    As its sixth ground for relief, the Houston Zoo alleges that Defendant's actions and inactions described herein constitute unfair competition under Texas common law.

101.    The Houston Zoo has no adequate remedy at law for the damage caused thereby.

**VII.    APPLICATION FOR TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, AND PERMANENT INJUNCTION**

102.    The Houston Zoo incorporates by reference herein the allegations set forth in the above-referenced paragraphs.

103.    The Houston Zoo has demonstrated above that it has a probable right to success on the merits of this case.

104.    If Defendant is allowed to take advantage of its infringing conduct and unfairly compete with the Houston Zoo by confusing Houston Zoo customers, the Houston Zoo will be immediately and irreparably injured for which there is no adequate remedy at law.

105.    Defendant has created the threat of loss of significant additional business and deterioration of the goodwill the Houston Zoo has built over nearly a century, the value of which cannot be precisely calculated at this time.

106.    Moreover, there is no risk of damage to Defendant if an injunction is granted against it. Defendant has no legal right to use the Houston Zoo's marks and profit from infringing them.

107.    The public interest would be best served by the issuance of the injunctive relief the Houston Zoo seeks because Defendant's actions are destructive to a non-profit entity devoted to public enrichment and education. Moreover, Defendant's conduct is actively harming the public by confusing them and should be stopped immediately.

108.    As such, the Houston Zoo seeks a temporary restraining order ordering that:

a)      Defendant and each of its agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with any of them shall not use the Infringing Marks, HOUSTON AQUARIUM AND ZOO and HOUSTON INTERACTIVE AQUARIUM AND ZOO, as well as any other names or marks substantially similar to the HOUSTON ZOO Marks, whether or not accompanied by a logo, or any other designation alone or in combination with other words or symbols, as a trademark, trade name component or otherwise, to market, advertise, distribute or identify Defendant's products and services.

b)      Defendant shall cease all use of the designations HOUSTON INTERACTIVE AQUARIUM AND ZOO and HOUSTON AQUARIUM AND ZOO in its business, and shall refrain from any such further use.

c)      Defendant shall delete any references to "Houston Aquarium and Zoo" and "Houston Interactive Aquarium and Zoo" on its website located at https://houstonaquariumtx.com/ and shall refrain from any such further use.

d)      Defendant shall take down the Facebook page located at the following website address (URL) and which infringes the HOUSTON ZOO marks: https://www.facebook.com/pages/Houston-Interactive-Aquarium-and-Zoo/1182140678606242

e)      Defendant shall not make any references to "Houston Aquarium and Zoo" and "Houston Interactive Aquarium and Zoo" on any social media page, including but not limited to Facebook;

f) Defendant shall not disseminate any advertising, including online advertising, that uses the terms "Houston" and "Zoo;"

g) Should Defendant fail to comply with steps c) through f), the Houston Zoo may contact Defendant's web hosting service provider, domain name registrar, Facebook, and relevant search engine providers, respectively, and inform those entities that Defendant's refusal to take such steps as ordered by this Court constitutes a violation of this Court's Order, and that those hosting entities shall take every step necessary to effectuate the relief granted in this Order; and

h) Defendant shall not use any designation of origin or description or representation which falsely suggests or represents an association or connection with the Houston Zoo.

109. After entry of the temporary restraining order, the Houston Zoo requests this Court then enter a preliminary injunction, and, upon final judgment, a permanent injunction, ordering that:

a) Defendant and each of its agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with any of them shall not use the Infringing Marks, HOUSTON AQUARIUM AND ZOO and HOUSTON INTERACTIVE AQUARIUM AND ZOO, as well as any other names or marks substantially similar to the HOUSTON ZOO Marks, whether or not accompanied by a logo, or any other designation alone or in combination with other words or symbols, as a trademark, trade name component or otherwise, to market, advertise, distribute or identify Defendant's products and services.

b) Defendant shall cease all use of the designations HOUSTON INTERACTIVE AQUARIUM AND ZOO and HOUSTON AQUARIUM AND ZOO in its business, and shall refrain from any such further use.

c) Defendant shall delete any references to "Houston Aquarium and Zoo" and "Houston Interactive Aquarium and Zoo" on its website located at https://houstonaquariumtx.com/ and shall refrain from any such further use;

d) Defendant shall take down the Facebook page located at the following website address (URL) and which infringes the HOUSTON ZOO marks: https://www.facebook.com/pages/Houston-Interactive-Aquarium-and-Zoo/1182140678606242

e) Defendant shall not make any references to "Houston Aquarium and Zoo" and "Houston Interactive Aquarium and Zoo" on any social media page, including but not limited to Facebook;

f) Defendant shall not disseminate any advertising, including online advertising, that uses the terms "Houston" and "Zoo;"

g)      Should Defendant fail to comply with steps c) through f), the Houston Zoo may contact Defendant's web hosting service provider, domain name registrar, Facebook, and relevant search engine providers, respectively, and inform those entities that Defendant's refusal to take such steps as ordered by this Court constitutes a violation of this Court's Order, and that those hosting entities shall take every step necessary to effectuate the relief granted in this Order; and

h)      Defendant shall not use any business name that contains the words "Houston" and "Zoo," and confirm to the Houston Zoo in writing within thirty (30) days that it has filed a certificate of termination or certificate of amendment with the Texas Secretary of State either terminating the business or amending the business name "Houston Aquarium and Zoo LLC";

i)      Defendant shall not use any designation of origin or description or representation which falsely suggests or represents an association or connection with the Houston Zoo; and

j)      Defendant shall pay the Houston Zoo its fees and costs for obtaining this relief.

110.    The Houston Zoo files its brief in support of its temporary restraining order contemporaneously herewith.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, in consideration of the foregoing, the Houston Zoo respectfully requests that this Court enter an Order and Judgment providing the following relief:

a)      Entering a judgment that the Houston Zoo's HOUSTON ZOO Marks have been and continue to be infringed by Defendant in violation of 15 U.S.C. § 1114(1);

b)      Entering a judgment that Defendant's use of the Infringing Marks, "HOUSTON AQUARIUM AND ZOO" and "HOUSTON INTERACTIVE AQUARIUM AND ZOO" constitutes federal unfair competition in violation of 15 U.S.C. § 1125(a);

c)      Entering a judgment that Defendant's use of its Infringing Marks violates the Texas Anti-Dilution Statute;

d)      Entering a judgment that Defendant's use of its Infringing Marks violates Texas state common law trademark infringement and unfair competition laws;

e)      Issuing a temporary restraining order, and a preliminary and permanent injunction, granting the Houston Zoo the relief outlined in Section VII. above;

f)      Enjoining and restraining the Defendant and each of its agents, employees, officers, attorneys, successors, assigns, affiliates and any persons in privity or active concert or participation with any of them from using the Infringing Marks, as well as any

33

other names or marks substantially similar to them, whether or not accompanied by a logo, or any other designation alone or in combination with other words or symbols, as a trademark, trade name component or otherwise, to market, advertise, distribute or identify Defendant's products and services;

g)   Pursuant to 15 U.S.C. § 1116(a), directing Defendant's to file with the Court and serve on the Houston Zoo within thirty (30) days after issuance of the preliminary injunction and the permanent injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendant has complied with the injunction;

h)   Pursuant to 15 U.S.C. § 1118, requiring that Defendant and all others acting under Defendant's authority, at their cost, be required to deliver up, remove, disable and/or destroy, as appropriate, all devices, literature, websites, social network pages, advertising, labels and other material in their possession bearing the Infringing Marks;

i)   Ordering Defendant to account to the Houston Zoo for, and disgorge to the Houston Zoo, all profits they have derived as a result of the unlawful acts complained of above;

j)   Awarding to the Houston Zoo all profits received by Defendant from sales and revenues of any kind made as a result of its infringing actions pursuant to 15 U.S.C. § 1117;

k)   Awarding the Houston Zoo its actual damages, in an amount to be proved at trial;

l)   Awarding the Houston Zoo its attorneys' fees and costs as provided in 15 U.S.C. § 1117; and

m)   Granting the Houston Zoo such other and further relief as the Court may deem just.

Dated: May 1, 2018                          Respectfully submitted,

**BAKER & HOSTETLER LLP**

By: */s/ Kody D. L. Kleber*
     Kody D. L. Kleber
     Attorney-In-Charge
     Texas State Bar #24060098
     Southern District of Texas Bar #952918
     kkleber@bakerlaw.com
     811 Main Street, Suite 1100
     Houston, Texas 77002
     (713) 751-1600 Telephone
     (713) 751-1717 Facsimile

34

**OF COUNSEL:**

Eric W. Kristiansen
ekristiansen@bakerlaw.com
Texas State Bar #24027428
Southern District of Texas Bar #27171
Kelsey M. Sproull
Texas State Bar #24079379
Southern District of Texas Bar #1829845
ksproull@bakerlaw.com
Baker & Hostetler LLP
811 Main Street, Suite 1100
Houston, Texas 77002
(713) 751-1600 Telephone
(713) 751-1717 Facsimile

**ATTORNEYS FOR PLAINTIFF,
HOUSTON ZOO, INC. D/B/A THE
HOUSTON ZOO**